AUSA: Jennifer N. Ong

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 24 MAG 734

UNITED STATES OF AMERICA

v.

MAXIMILIEN DE HOOP CARTIER,
   a/k/a "Maximilano de Hoop Cartier,"
   a/k/a "Max Cartier,"

                      Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 1344,
1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h),
1957, 1960 and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

      Daniel J. Letts, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Money Laundering)

      1.    From at least in or about May 2023 through at least in or about November 2023, in the Southern District of New York and elsewhere, MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

      2.    It was a part and an object of the conspiracy that MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, and which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Section 841, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h).)

### COUNT TWO
### (Money Laundering)

      3.    From at least in or about January 2020 through the present, in the Southern District of New York and elsewhere, MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop

Cartier," a/k/a "Max Cartier," the defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, bank fraud, in violation of Title 18, United States Code, Section 1344, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNT THREE
### (Bank Fraud)

4.      From at least in or about January 2020 through the present in the Southern District of New York and elsewhere, MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, CARTIER opened accounts at financial institutions in the New York, New York and elsewhere, and falsely represented to the financial institutions that the accounts would be used primarily for software or technology related transactions, even though CARTIER knew the accounts would be used, and in fact were used by CARTIER and others, to transmit funds on behalf of an unlicensed money remitting business related to the operation of a cryptocurrency exchange, which passed through banks located in Manhattan, New York and elsewhere.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT FOUR
### (Operation of an Unlicensed Money Transmitting Business)

5.      From at least in or about January 2020 through the present in the Southern District of New York and elsewhere, MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce and  (i) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor or a felony under State law; and (ii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section;, to wit, CARTIER controlled and operated multiple companies and bank accounts in the United States which he used to operate an unlicensed money remitting business.

(Title 18, United States Code, Sections 1960 and 2.)

## COUNT FIVE
### (Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity)

6.  On or about August 22, 2023, in the Southern District of New York and elsewhere, MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, CARTIER sent a $500,000 wire transfer to a Colombian company consisting of proceeds from the bank fraud charged in Count Three of this Complaint.

(Title 18, United States Code, Section 1957 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.  I have been a Special Agent with the FBI since 2017. In that capacity, I have participated in investigations into money laundering, fraud, narcotics trafficking and other offenses, and have spoken with other FBI agents as well as other law enforcement officers who personally participated in the investigation of this matter along with other law enforcement agents.

8.  I make this Complaint based in part on personal knowledge acquired from my participation in the investigation; my review of reports and other documents prepared by law enforcement agents and others; judicially authorized searches of email and iCloud accounts, conversations with confidential sources, conversations with undercover officers, review of bank records and other documents, and physical surveillance. Throughout this Complaint, I will refer to contracts and recorded conversations and messages between confidential sources, undercover officers, co-conspirators, and MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and his co-conspirators. Unless otherwise stated, these contracts are in Spanish and the conversations occurred in Spanish. I have reviewed draft translations of these contracts, conversations and messages, and I make this Complaint based on my review of those draft translations.

9.  Throughout this Complaint, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified law-enforcement officer to whom I have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated.

10.  Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Complaint. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Complaint, I rely only on the facts stated herein. Where dates, times, and amounts are indicated, they are approximate.

## Cryptocurrency and Tether

11. Based on my training, research, education, experience, and discussions with other law enforcement officers, I am familiar with the following relevant terms and definitions:

a. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.[1] Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.

b. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[2]

c. Tether ("USDT") is an alternative type of cryptocurrency or altcoin token. Payments or transfers of value made with Tether are recorded in the blockchain network, but unlike decentralized cryptocurrencies like Bitcoin, Tether has some features of centralization. One centralized feature is that Tether is a Stablecoin or a fiat-collateralized token that is backed by fiat currencies, or currencies issued by governments like the U.S. Dollar and Euro. Tether is backed with a matching one to one fiat amount, making it much less volatile than its counterpart, Bitcoin.

d. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, approximately 26 to 36 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key-the cryptographic equivalent of a password or PIN-needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

e. Although cryptocurrencies such as Bitcoin and Ether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money

---

[1] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

[2] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

4

laundering and as a means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

12. Based on my experience and training, my participation in this investigation, and conversations with other law enforcement officers, I know that drug trafficking organizations ("DTOs") use the international trade and financial systems to transfer money obtained through the sale of narcotics in the United States across international borders and disguise the illicit origins of the proceeds. Specifically, after drugs are sold for dollars in the United States or elsewhere, a foreign DTO may extend a "contract," which is an offer to purchase the narcotics proceeds, to a money laundering broker. Once the U.S. dollars are delivered to the broker or agents of the broker, typically through a bulk cash pickup in the United States, the broker will then transfer funds or goods to the foreign DTO at their direction; recently, at least some DTOs are using cryptocurrency. For example, after the bulk cash pickup, the broker will transfer an agreed amount of cryptocurrency to a cryptocurrency wallet owned or controlled by the foreign DTO.

## Background

13. Based on my participation in this investigation, my conversations with a confidential source ("CS-1")[3]; my review of open source materials and other documents gathered in connection with this investigation, and my conversations with other law enforcement agents, I have learned the following, in substance and in part, about MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant:

   a. CARTIER is an Argentinian citizen who has had residences around the world, including in France, California, and Switzerland.

   b. CARTIER is purportedly a direct descendant of Louis-Francois Cartier—the master jeweler who created the luxury brand, Cartier. Additionally, CARTIER purports to be a philanthropist, entrepreneur, art collector, and industrialist and investor in beverages and "fintech" as well as a singer under the name "Max Cartier."

   c. As set forth in more detail below, based on my review of open source materials, bank records, business registration documents, and tax records, I have learned that CARTIER controls, operates, or is connected to several U.S.-based shell companies. These shell companies were all incorporated in Delaware by the same registered agent. These companies (collectively, the "Cartier Companies") include:

      i. Vintech Capital LLC ("Vintech Capital"). Vintech Capital was incorporated in or about July 2018. CARTIER is the "responsible

---

[3] CS-1 was charged by federal complaint with conspiracy to commit money laundering and operation of an unlicensed money transmission business. That complaint has been dismissed, but CS-1 has been cooperating with law enforcement ever since based on the understanding that CS-1 will plead guilty to those charges and in the hopes of obtaining leniency at sentencing. Information provided by CS-1 has been proven reliable and has been corroborated by, among other things, law enforcement seizures of drugs, surveillance, recorded phone calls, recorded meetings, bank records, and arrests of narcotics traffickers.

member." According to documents submitted to the Internal Revenue Service ("IRS"), Vintech Capital purports to provide services in the financial sector. According to its website, Vintech Capital is an "Over the counter (OTC) Digital Currency trading desk for institutional buyers and sellers."

ii. VC Innovated LLC ("VC Innovated"). VC Innovated was incorporated in or about September 2019. CARTIER is listed as the "responsible member." According to documents submitted to the IRS, VC Innovated purports to provide the following services: "Blockchain Technology, AI [artificial intelligence], VR [virtual reality]."

iii. AZ Technologies LLC ("AZ Technologies"). AZ Technologies was incorporated in or about January 2020. Another individual ("Individual-1") is listed as the "responsible member," and CARTIER is listed as the billing, communications, and mail forwarding contact. According to documents submitted to the IRS, AZ Technologies purports to provide the following services: "Software, Hardware, AI, and Blockchain Technology."

iv. Softmill LLC ("Softmill"). Softmill was incorporated in or about January 2020. Individual-1 is listed as the "responsible member," and CARTIER is listed as the billing, communications, and mail forwarding contact. According to documents submitted to the IRS, Softmill purports to provide the following services: "Software, Hardware, AI, and Blockchain Technologie [sic]."

v. Sun Technologies LLC ("Sun Technologies"). Sun Technologies was incorporated in or about November 2020. Another individual ("Individual-2") is listed as the "responsible member," and CARTIER is listed as the billing, communications, and mail forwarding contact. According to documents submitted to the IRS, Sun Technologies purports to provide the following services: "Digital Technology Solution."

vi. Bullpix Solutions LLC ("Bullpix"). Bullpix was incorporated in or about November 2020. Individual-2 is listed as the "responsible member," and CARTIER is listed as the billing, communications, and mail forwarding contact. According to documents submitted to the IRS, Bullpix purports to provide the following services: "Digital advertising, IT platform, Software."

14. Based on my review of bank records, I have learned that all of the Cartier Companies have, or had, multiple bank accounts at multiple U.S. banks. In opening these bank accounts, I have learned that MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, provided false information about the Cartier Companies. In general, and among other things, CARTIER stated that the Cartier Companies were in the business of software or technology when in fact, as set forth in more detail below, the Cartier

6

Companies were operating as unlicensed money remitting businesses related to the operation of a cryptocurrency exchange. For example:

      a. In or about August 2018, CARTIER opened an account for Vintech Capital a particular U.S bank ("Bank-1"), headquartered in New York, New York. The application materials to Bank-1 indicated that Vintech Capital was in the business of "Software Publishers."

      b. In or about October 2019, CARTIER opened an account for VC Innovated at Bank-1. The application materials to Bank-1 indicated that VC Innovated was in the business of "software publishers" and "app development and fin technology."

      c. In or about February 2020, CARTIER opened an account for AZ Technologies at Bank-1. The application materials to Bank-1 indicated that AZ Technologies was in the of "Software Publishers" industry.

      d. In or about March 2020, CARTIER opened an account for Softmill at a particular U.S. bank ("Bank-2"). The application materials to Bank-2 state that Softmill was in the business of data processing, hosting, and related services, as well as "application software."

      e. In or about November 2021, CARTIER opened an account for Sun Technologies at a particular U.S. bank ("Bank-3"). The application materials to Bank-3 indicated that Sun Technologies was a "Software Dev Company" and in the "Services-Business."

      f. In or about November 2021, CARTIER opened an account for Bullpix at a particular U.S. bank ("Bank-4"). The application materials to Bank-4 indicated that Bullpix was in the "Professional, Scientific, and Technical Services" industry and provided the following business description: "Software development and implantation." In addition, CARTIER submitted falsified bank statements to Bank-4 in order to upgrade Bullpix's account at Bank-4.

      15. Based on my review of financial records and an email account belonging to MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, pursuant to a judicially authorized search, I know that CARTIER provided at least some of these false statements regarding the Cartier Companies via email to a Bank-2 representative who was located in New York, New York.

      16. CS-1 has known and worked with MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, since at least in or about January 2020. As set forth in more detail below, *see infra* ¶ 21(e), since at least in or about January 2020, CARTIER has wired tens of millions of U.S. dollars from his U.S.-based bank accounts for VC Innovated, AZ Technologies, and Sun Technologies to CS-1's shell companies in Colombia. These wire transfers were done pursuant to fake services contracts, and CS-1 has confirmed that none of his companies performed any work pursuant to those contracts for VC Innovated, AZ Technologies, or Sun Technologies. *See infra* ¶ 21(a)-(d). According to CS-1, these transfers were made as part of the money laundering network described below to convert UDST (representing the proceeds of illicit activity) to fiat currency.

7

## Overview of the Money Laundering Network

17.     Since in or about February 2022, the FBI, along with the Department of Homeland Security, Homeland Security Investigations ("HSI") and the Internal Revenue Service, Criminal Investigation ("IRS-CI"), have been investigating a money laundering network that operates in the United States and Colombia, among other countries (the "Network"). The Network utilizes the U.S. financial system to, among other things, launder criminal proceeds from other countries to Colombia. To distance themselves from the criminal activity, members of the Network often place, layer, and integrate the illicit proceeds into the U.S. financial system.

18.     Based on my training, experience, participation in this investigation, conversations with CS-1; review of messages, emails, and documents from email and iCloud accounts belonging to MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and others pursuant to a judicially authorized searches of those accounts; review of audio and text messages exchanged between CARTIER and CS-1 and CARTIER and an undercover FBI agent ("UC-1"), and review of recorded meetings between CS-1 and CARTIER's co-conspirators, I have learned the following, in substance and in part:

   a.     Members and associates of the Network, including CARTIER, work together to launder funds (representing the proceeds of illicit activity) through the U.S. financial system to Colombia, which is often referred to as "monetization." Monetization occurs more frequently and at larger volumes when the exchange rate between the U.S. dollar and the Colombian Peso ("COP") is most favorable to maximize profit.

   b.     As described in more detail below, members and associates of the Network each have separate roles within the Network to facilitate the monetization of funds. Each role is responsible for a particular component of the laundering within the Network. One cycle of monetization (*i.e.*, the movement of funds) through the Network generally operates as follows:

   i. Illicit proceeds (such as from drug trafficking or bank fraud) that are located in a country outside of Colombia (such as in the United States or Mexico) are converted from fiat currency to USDT by a main provider of USDT to the Network (referred to herein as "Main Providers") or a partner of the Main Provider. Main Providers, or their partners, typically purchase the USDT below market value (*i.e.*, at the largest discount or most favorable exchange rate) because that person is at the greatest risk of being connected to the underlying criminal activity, such as drug trafficking, and therefore receive the largest commission.

   ii. Next, a Main Provider works with another individual within the Network (referred to herein as a "Provider") to send the USDT to a facilitator within the Network (referred to herein as "Facilitators"). Facilitators within the Network connect Main Providers and Providers to individuals in the Network that can convert the USDT back to fiat currency (referred to herein as "US Clients"). US Clients often have U.S.-based shell companies (*i.e.*, a company without active business operations) and U.S.-based bank accounts. Using these shell companies

8

    and bank accounts, US Clients use relationships with established cryptocurrency exchanges to act as an over-the-counter ("OTC") cryptocurrency exchange to convert USDT to fiat currency.

   iii. US Clients then wire the fiat currency (less a commission) from their shell company's U.S.-based bank account to a Colombia-based shell company's bank account in Colombia. These Colombia-based shell companies are often controlled or operated by members or associates of the Network (referred to herein as "Colombian Clients"). The wires are purported to be for the provision of technology services from the Colombian Clients to the US Clients and, often times, US Clients and Colombian Clients use fake technology services contracts to justify the wire to Colombian banks.

   iv. The Colombian Clients then use their network of Colombian shell companies and other individuals to withdraw funds in COP from various Colombian banks to deliver to the Main Providers or their associates.

  c. There are different cells within the Network that are comprised of specific Main Providers, Providers, Facilitators, US Clients, and Colombian Clients that repeatedly work with one another to monetize (*i.e.*, launder illicit funds) through the Network.

  d. CARTIER operates as a US Client for the Network and, as discussed in more detail above, *see supra* ¶¶ 13(c) and 14, CARTIER has multiple U.S.-based shell companies and U.S.-based bank accounts that he uses to monetize with the Network.

  e. Between at least in or about May 2023 and at least in or about November 2023, CARTIER worked with a particular cell within the Network (the "Cartier Cell") that consisted of a Main Provider ("CC-1"), a Provider ("CC-2"), and two Colombian Clients ("CC-3" and "CC-4"). At the direction of law enforcement, CS-1 acted as the Facilitator for the Cartier Cell.

### Overview of the Cartier Cell

  19. Based on my participation in this investigation; my conversations with CS-1; my review of audio and text messages between CS-1, MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and CC-2, CC-3, and CC-4; my review of financial records; and my conversations with other law enforcement officers, I have learned the following, in substance and in part:

  a. Between on or about May 1, 2023 and on or about November 29, 2023, the Cartier Cell monetized together. During this time, CS-1, at the direction of law enforcement, facilitated the movement of a total of approximately $14.5 million USDT from CC-1 and CC-2 to CARTIER over the course of approximately 62 monetization cycles. For the most part, CARTIER instructed CS-1 to transfer USDT that CS-1 had received from CC-1 and CC-2 to cryptocurrency wallets that were controlled by certain cryptocurrency exchanges. CARTIER then received a deposit of U.S dollars from these cryptocurrency exchanges into Bullpix's account at Bank-4.

9

    b.  CARTIER then used Bullpix to wire approximately $14.4 million U.S. dollars (across multiple transactions) to one of four Colombian companies: Panamerican Private Investments SAS ("Panamerican"), Big Data Technology SAS ("Big Data"), Totentic SAS ("Totentic"), or Maphing Ideas SAS ("Maphing") (collectively, the "Colombian Companies").

    c.  CC-3 controls, operates, or is associated with Big Data, Totentic, and Maphing. CC-4 controls, operates, or is associated with Panamerican.

    d.  CARTIER received a commission for laundering illicit proceeds on behalf of CC-1 and CC-2, which he usually took after converting the USDT to U.S. dollars but before transferring the U.S. dollars from Bullpix to one of the Colombian Companies. CS-1, CC-3, and CC-4 also received a commission for their part in each monetization cycle.

    e.  Because CS-1 is the Facilitator of the Cartier Cell, the other members of the Cartier Cell generally did not communicate directly with one another. In other words, in general, CARTIER did not communicate with CC-1 or CC-2 and CARTIER did not communicate directly with CC-3 or CC-4. Instead, CARTIER typically used CS-1 to communicate with CC-1, CC-2, CC-3, and CC-4.

### The Cartier Cell in Operation

  20.  Based on my training, experience, participation in this investigation, conversations with CS-1, and conversations with other law enforcement officers, I have learned that banks in Colombia generally require documentation to justify incoming U.S. dollar wires from the United States.

  21.  As set forth in more detail below, I believe that the Cartier Cell utilized fake contracts between Bullpix and the Colombian Companies to justify wires from Bullpix to the Colombian Companies. Based on my training, experience, and participation in this investigation; my conversations with other law enforcement officers; my conversations with CS-1; and my review of text and audio messages exchanged between CS-1 and MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, CC-3, and CC-4, I have learned the following, in substance and in part:

    a.  Prior to monetizing through the Cartier Cell, Bullpix entered into fake technology services contracts with the Colombian Companies. As the Facilitator for the Cartier Cell, CS-1 received the contracts from CC-3 and CC-4 to transmit to CARTIER. CARTIER often asked CS-1 when CS-1 would be sending the contracts to CARTIER. For example, on or about March 27, 2023, CARTIER asked CS-1: "When will you be sending the contacts?" As another example, on or about April 12, 2023, CARTIER told CS-1: "See if you can send me the contracts please," and two days later, on or about April 14, 2023, CARTIER asked CS-1: "Are you sending the contracts?" Based on my training, experience, participation in this investigation, and my review of conversations with CS-1 and other law enforcement officers, I believe that CARTIER was asking CS-1 for the contracts because CARTIER understood that the contracts were necessary for the Cartier Cell to monetize.

    b.  As set forth in more detail below, Bullpix entered into contracts with each of the Colombian Companies:

10

i. On or about March 28, 2023, at approximately 11:15 a.m., CC-4 sent a contract to CS-1 for Bullpix and Panamerican ("Panamerican Contract-1"). The object for the Panamerican Contract was listed as "DEVELOPMENT, IMPLEMENTATION, SUPPORT, IMPROVEMENT AND MAINTENANCE SERVICE FOR BUSINESS ADMINISTRATION SYSTEMS." At approximately 11:18 a.m., CS-1 sent the Panamerican Contract to CARTIER and CARTIER returned an executed version of the contract to CS-1 approximately 17 minutes later. This version of the Panamerican Contract was signed by CC-4 on behalf of Panamerican and by Individual-2 on behalf of Bullpix.

ii. On or about August 8, 2023, CC-4 sent two contracts to CS-1 for Bullpix and Panamerican ("Panamerican Contract-2") and for Sun Technologies and Panamerican ("Sun Technologies Contract"). Both contracts were in English. CS-1 sent both contracts to CARTIER at approximately 2:57 p.m. and CARTIER returned both contracts to CS-1 approximately 6 minutes later. Both contracts were signed by CC-4 on behalf of Panamerican and by Individual-2 on behalf of Bullpix. The object for Panamerican Contract-2 was "EXPERT ADVISOR [EA] FOR AUTOMATIC FOREX INVESTMENTS – GAUSS BELL" and contemplated a budget of approximately $2,983,500 U.S. dollars. The object for the Sun Technologies Contract was "EXPERT ADVISOR (EA) FOR AUTOMATIC FOREX INVESTMENTS – GRID METHODOLOGY" and contemplated a budget of approximately $4,590,000 U.S. dollars. Both contracts contained payment schedules, which corresponded to four payments on invoices for each contract.

iii. On or about April 17, 2023, at approximately 3:42 p.m., CC-3 sent CS-1 a contract between Bullpix and Big Data (the "Big Data Contract"), which was signed by CC-3 on behalf of Big Data. CS-1 sent the Big Data Contract to CARTIER and, approximately one hour later, CARTIER sent a version of the Big Data Contract that had been signed by Individual-2 on behalf of Bullpix. CS-1 then sent the fully executed version of the Big Data Contract to CC-3.

iv. On or about May 10, 2023, CC-3 sent CS-1 two contracts between Bullpix and Maphing (the "Maphing Contract") and between Bullpix and Totenic (the "Totenic Contract"). At approximately 9:09 a.m., CS-1 sent the Maphing Contract and the Totenic Contract to CARTIER. Approximately 7 minutes later, CARTIER returned both contracts to CS-1 and CS-1 sent both contracts to CC-3. The contracts were both signed by Individual-2 on behalf of Bullpix. The Totenic Contract was signed by a person connected to CC-3 ("Individual-3") on behalf of Totenic, and the Maphing Contract was signed by another individual.

    v. Based on my review of the Big Data Contract, the Totenic Contract, and the Maphing Contract, I know that the contracts are nearly identical except for the names of the parties, the companies, and the signatures. For example, I know that the contracts all have the same title and the same object.

  22. Based on my review of bank records, my participation in this investigation, and my conversations with law enforcement agents and CS-1, I know that Bullpix wired approximately $5.3 million U.S. dollars over the course of approximately 28 wires to Panamerican between in or about August 10, 2023 and on or about November 29, 2023. Based on my review of Panamerican Contract-2, I know that Bullpix transferred more than $2 million U.S. dollars more than what was contemplated by Panamerican Contract-2 and that these transfers did not align with the payment schedule set forth in Panamerican Contract-2.

  23. As set forth in more detail below, I know that companies controlled or operated by MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, have entered into similar purported technology contracts with Colombian shell companies connected to CS-1. Based on my participation in this investigation, my conversations with CS-1, my review of an email account belonging to CS-1 pursuant to a judicially authorized search, my review of audio and text messages exchanged between CS-1 and CARTIER, my review of bank records, and conversations with other law enforcement officers, I have learned the following, in substance and in part:

    a. CS-1 was the legal representative, owner, partner, or affiliate of three purported technologies companies based in Colombia: "Company-1," "Company-2," and "Company-3." On consecutive dates in or about January 2020, VC Innovated entered into three nearly identical contracts, with only small variations in the logo, name, and value of the contracts, with Company-1, Company-2, and Company-3. All three contracts contained the same subject: "COMPUTER SECURITY SOFTWARE LICENSE AND SOFTWARE MAINTENANCE."

      i. On or about January 13, 2020, CARTIER (as the legal representative for VC Innovated) and CS-1 (as the legal representative for Company-1) entered into a contract worth approximately $452,350 U.S. dollars.

      ii. On or about January 14, 2020, CARTIER (as the legal representative for VC Innovated) and CS-1 (as the legal representative for Company-2) entered into a contract worth approximately $720,280 U.S. dollars.

      iii. On or about January 15, 2020, CARTIER (as the legal representative for VC Innovated) and CS-1 (as the legal representative for Company-3) entered into a contract worth approximately $638,540 U.S. dollars.

    b. CS-1 has stated that these contracts were fake and that neither Company-1, Company-2, nor Company-3 performed any work pursuant to these contracts. Nevertheless, between in or about January 2020 and in or about July 2020, VC Innovated, Sun Technologies, and AZ Technologies wired a total of approximately $43,036,568 U.S. dollars to Company-1, Company-2, and/or Company-3. CS-1 told law enforcement that these movements were to launder funds using the Network.

24. Based on my training, experience, participation in this investigation, including my review of communications involving MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and CC-3 and CC-4, my review of communications involving CS-1, and including and the fact that (i) the contracts are transmitted to and from CARTIER and CC-3 and CC-4 through CS-1; (ii) there is a lack of discussion or negotiation regarding the contracts or the services provided between CARTIER, CC-3, and CC-4; (iii) the contracts are nearly identical to other contracts that are sent or received around the same time; (iv) CS-1 has stated that the contracts were fake and only used to justify incoming wires to the Colombian banks; (v) CARTIER entered into similar fake contracts with CS-1 just a few years earlier, (vi) to date, the investigation has not revealed any invoices from the Colombian Companies to Bullpix, and (viii) Bullpix's transfers to Panamerican did not align with the terms of Panamerican Contract-2, there is cause to believe that Panamerican Contract-1, Panamerican Contract-2, the Sun Technologies Contract, the Big Data Contract, the Maphing Contract, and the Totenic Contract are all fake contracts, that no services were provided to Bullpix pursuant to the contracts, and the contracts were used to justify wires from Bullpix to the Colombian Companies.

25. Based on my training, experience, and participation in this investigation; my conversations with other law enforcement officers; my conversations with CS-1; my review of text and audio messages exchanged between CS-1 and MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, CC-2, CC-3, and CC-4, and my review of bank records, I have learned the following, in substance and in part, about how the Cartier Cell generally operated in the approximately 62 monetization cycles that it completed together between in or about May 2023 and in or about November 2023:

a. In general, a monetization cycle started with CC-2 telling CS-1 how much USDT CC-2 and CC-1 would be sending to CS-1. CC-2 would then send a photo of a phone showing transaction details to confirm that CC-1 or CC-2 had in fact sent USDT to a wallet provided by CS-1, which was in fact controlled by law enforcement.

b. CS-1, at the direction of law enforcement, would then communicate to CARTIER how much USDT that CS-1 would be sending to CARTIER. CARTIER would then provide two cryptocurrency wallet addresses to CS-1. CS-1, at the direction of law enforcement, would then send a screenshot of the transaction details to CARTIER, which showed a certain amount of USDT being sent to CARTIER's cryptocurrency wallet.

c. Shortly thereafter, Bullpix would receive wire transfer in U.S. dollars from a cryptocurrency exchange to Bullpix's bank account at Bank-4. The transfer would typically be for an amount similar to the amount of USDT that CS-1 had sent to CARTIER. At times, CS-1 would tell CARTIER which Colombian Company CARTIER should wire the funds to. CS-1 would get this information from CC-3 or CC-4.

d. Finally, CARTIER would send wire confirmation documents from Bank-4 to CS-1. In general, the stated "Purpose of Payment" was "Invoice Payment." Finally, many of these wire confirmation documents stated that the intermediary banks were located in New York, New York.

## Connections to Narcotics Trafficking

26.     For the reasons set forth below, I believe that at least some of the funds that were laundered by the Cartier Cell represented the proceeds of drug trafficking. Based on my review of criminal history records; my review of recorded conversations between CS-1, CC-1, and CC-2; my conversations with other confidential sources, my conversations with other law enforcement officers, including an undercover agent with foreign law enforcement; my review of reports and records; and my participation in this investigation, I have learned the following:

  a.    On or about September 15, 2023, CS-1, at the direction of law enforcement, met with CC-1, CC-2, and CC-1's son ("CC-5"). The meeting was audio and video recorded and surveilled by law enforcement. During the meeting, CS-1, CC-1, CC-2, and CC-5 discussed their monetization business and the following, in substance and in part:

    i. CS-1 asked CC-1 why the margins were so tight. CC-1 responded by saying that "merca" is cheap everywhere and business is good. CC-1 then stated that there is consumption but that he thought they were sending too much now. Shortly thereafter, CC-1 mentioned a newspaper article that came out a few days earlier, which discussed how cocaine is the main export of Colombia. Based on my training, experience, participation in this investigation, conversations with CS-1, and conversations with other law enforcement officers, I have learned that "merca" is commonly used by drug dealers to reference drugs. Accordingly, I believe in this portion of the conversation, CC-1 is discussing cocaine.

    ii. During a different portion of the conversation, CS-1, at the direction of law enforcement, offered to pick up money for CC-1 in another country. CC-1 then explained that "it's not like I bring the drugs, sell the drugs and collect the money to go down to buy Tether, no." CC-5 then added that "[t]here are people who do that." CC-1 then continued: "There are people who do that; I buy and that's it." Based on the context of this conversation; my training, experience, and participation in this investigation; my conversations with CS-1, and my conversations with other law enforcement officers, I believe that CC-1 is advising CS-1 that CC-1 does not sell drugs personally but rather that he works or is associated with "people who do that" and CC-1 buys the Tether that represents the proceeds of drug trafficking.

  b.    On or about September 21, 2023, at the direction of law enforcement, CS-1 had an audio recorded meeting with CC-2. During their conversation, CS-1 said to CC-2, "you know the money we handle comes from drug trafficking, right?" CC-2 then responded that the "money comes from there but cryptocurrency is being sold"—a reference to the monetization process with the Network.

14

c.  In or about October 2023 and November 2023, at the direction of law enforcement, CS-1 arranged a controlled purchase of cocaine paste[4] from CC-2, her husband, and her brother-in-law. Payment for the deal was made in Tether to a particular cryptocurrency wallet provided by CC-2. CC-1 and/or CC-2 had previously used that cryptocurrency wallet to send USDT to CS-1 for purposes of laundering money through the Cartier Cell on approximately six different occasions.

d.  In or about April 2021, agents with the Drug Enforcement Administration ("DEA") seized bank accounts at a particular bank ("Bank-5") for VC Innovated, Softmill, and AZ Technologies because those companies had received approximately $937,648.98 U.S. dollars in total in suspect drug proceeds from an undercover DEA account.

### Additional Evidence of Bank Fraud & Unlicensed Money Transmission

27.  As set forth in more detail above, *see supra* ¶ 14, the Cartier Companies all have multiple U.S. bank accounts and application materials for these accounts all misrepresented, among other things, the true nature of the business of the Cartier Companies—*i.e.*, an unlicensed money remitting business related to the operation of a cryptocurrency exchange. Based on my review of bank records for the Cartier Companies and recorded conversations between CS-1 and MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, I believe that CARTIER receives a commission of approximately at least 0.5% for each transfer he conducts.

28.  As set forth in more detail below, I have learned that MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, knowingly misrepresented the nature of the business of the Cartier Companies to obfuscate the fact that his bank transfers are in fact related to conducting an unlicensed money transmission business. Based on my training, experience, participation in this investigation, conversations with CS-1 and other law enforcement officers, conversations with UC-1, and my review of recorded phone conversations between CS-1, UC-1, and CARTIER, I have learned the following, in substance and in part:

a.  On or about October 13, 2023, CS-1, at the direction of law enforcement, introduced UC-1 to CARTIER and the three of them had a recorded video call. During the call, CS-1 represented to CARTIER that UC-1 worked for someone that had USDT that needed to be transferred to banks in New York. CARTIER told UC-1 that he considers a particular hotel in New York to be his second home and CARTIER stated that is where he handles his cryptocurrency business, which includes his clients, lawyers, and banks.

b.  Additionally, CARTIER told UC-1 that he had worked with CS-1 for years and offered to help UC-1 liquidate the USDT. CARTIER explained that he preferred to do multiple smaller transactions in a day rather than one large transaction to avoid complications.

---

[4] Cocaine paste (also referred to as coca paste) is an intermediary product in the chemical extraction of cocaine from coca leaves. Based on my training, experience, involvement in this investigation, and conversations with other law enforcement officers, I have learned, in substance and in part, that cocaine paste is almost invariably converted into powder cocaine in the producing country before being exported to the United States.

15

CARTIER told UC-1 that he had transferred approximately $22 million U.S. dollars for a New York company in $500,000 increments. Based on my training, experience, participation in this investigation, and conversations with other law enforcement agents, I have learned that individuals who launder money or operate an unlicensed money transmitting business often try to transfer smaller amounts of money because large transfer may attract more scrutiny from banks.

        c.     CARTIER explained to UC-1 that his cryptocurrency company would not pay UC-1 but rather UC-1 would receive payment from a satellite company that purports not to be in the cryptocurrency business. CARTIER then explained to UC-1 that he uses satellite companies because banks tend to deny transfers or close accounts when the banks learn that CARTIER is working with cryptocurrency-friendly banks.

        d.     Following the conversation with UC-1 and CS-1, CARTIER had a recorded phone conversation with CS-1. During that call, CARTIER told CS-1 that he would send money to UC-1 from Bullpix or another account.

        e.     On or about December 7, 2023, UC-1 and CARTIER had another recorded phone conversation during which UC-1 and CARTIER did a test movement of approximately $10,000 USDT in preparation for a larger movement. During that phone call, CARTIER repeated multiple times to UC-1 that, even though UC-1 sent USDT to CARTIER, he would send UC-1 fiat currency from a bank that was not cryptocurrency-friendly and from a company that was an electronics or software company that does not mention cryptocurrency.

        f.     On or about December 11, 2023, UC-1 had a recorded phone conversation with CARTIER. CARTIER again explained that his companies "basically do cryptocurrency" and that CARTIER does not disclose this to banks because the banks would close his accounts. CARTIER also told UC-1 that Bullpix was related to technology, which is what is needed to operate with a traditional bank. CARTIER then explained that to avoid bank accounts being closed, he created a new company and does business under that name to avoid issues.

        g.     Based on my training, experience, participation in this investigation, and conversations with other law enforcement officers, I believe that CARTIER wanted to send the fiat currency from a company that was not related to cryptocurrency to conceal the source of the fiat currency.

    29.     As set forth above, Bullpix had an account at Bank-4. *See supra* ¶ 14(e). On or about August 22, 2023, Bullpix received a deposit from a cryptocurrency exchange for approximately $501,534.96 U.S. dollars to its account at Bank-4. Approximately 10 minutes later, Bullpix wired approximately $500,000 U.S. dollars to a company in Colombia. The wire details state that the transfer went through an intermediary bank located in New York, New York.

    30.     Based on my conversations with law enforcement officers and my review of bank records, I have learned that, to date, the Cartier Companies have transferred hundreds of millions of U.S. dollars to foreign entities using U.S. bank accounts, some of which travelled through intermediary banks located in the Southern District of New York.

31.     Based on records from the Financial Crimes Enforcement Network ("FinCEN") and my conversations with other law enforcement personnel, I have learned the following, in substance and in part:

    a.     MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and the Cartier Companies are not currently registered with FinCEN to operate as a money services business.

    b.     In or about July 2019, Vintech Capital registered with FinCEN as a money services business operating in, among other locations, New York. In or about October 2019, VC Innovated registered with FinCEN as a money services business operating in, among other locations, New York. To date, neither Vintech Capital nor VC innovated has renewed its registration with FinCEN.[5]

32.     Based on open source materials and my conversations with other law enforcement personnel, I understand that any individual applying for a license in New York to operate a money transmitting business through the Department of Financial Service must submit fingerprints with their application. Should an individual be fingerprinted as part of this process, I understand that the individual would be assigned a New York State Identification ("NYSID") in the National Crime Information Center("NCIC")/eJustice terminal.

33.     Based on my review of NCIC/eJustice records, I know that MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, has not been assigned a NYSID and his fingerprints do not appear in the NCIC/eJustice system. For this reason, I do not believe that CARTIER is registered to operate a money transmitting business in New York because he has not submitted an application for a license.

---

[5] *See* 31 C.F.R. § 1022.380(b)(2) ("A money services business must be registered for the initial registration period and each renewal period. . . . Each two-calendar-year period following the initial registration period is a renewal period."); *id.* § 1022.380(b)(3)("The registration form for a renewal period must be filed on or before the last day of the calendar year preceding the renewal period.").

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MAXIMILIEN DE HOOP CARTIER, a/k/a "Maximilano de Hoop Cartier," a/k/a "Max Cartier," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s Daniel J. Letts  (By Court with Authorization)
Daniel J. Letts
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (FaceTime), this 20th day of February, 2024.

_____
THE HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York

18